2025 IL App (1st) 230027

FIFTH DIVISION
March 21, 2025

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-23-0027

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 20231 |
| | ) | |
| RAYVONNE WILSON, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Oden Johnson and Navarro concurred in the judgment and opinion.

**OPINION**

¶ 1 To avoid the death penalty, Rayvonne Wilson pleaded guilty to first degree murder in exchange for a sentence of natural life in prison. As a factual basis for the plea, the State proffered the evidence deposition of the victim, Reginald Bradley, taken before his death, in which Reginald recounted coming to Chicago with his uncle to try to resolve a family dispute and being shot by Rayvonne, who was his cousin. The State also proffered the parties' stipulation that, if called to testify, Reginald's uncle would fully corroborate that account.

¶ 2 Rayvonne now appeals from the circuit court's denial of his motion for leave to file a successive postconviction petition raising a claim of actual innocence. In support of that petition, Rayvonne submitted the affidavits of four witnesses, including Reginald's uncle, who would

testify that Reginald was the one who drew the gun on Rayvonne, Rayvonne charged at Reginald, and the gun went off as the two struggled to gain control of it. The circuit court concluded that none of these witness accounts qualified as newly discovered evidence capable of supporting a claim of actual innocence. For the reasons that follow, we disagree. We reverse the court's denial of Rayvonne's motion to file a successive petition and remand for second-stage proceedings.

¶ 3                                     I. BACKGROUND

¶ 4                              A. Rayvonne's Guilty Plea

¶ 5     The State charged Rayvonne with numerous counts of first degree murder in connection with the shooting of his cousin Reginald Bradley on September 16, 2004. Facing the death penalty, on December 20, 2010, Rayvonne pleaded guilty to two counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)) in exchange for a sentence of life in prison. Reginald did not succumb to his wounds for almost a year, and the factual basis for the plea included those portions of Reginald's evidence deposition, taken on May 6, 2005, that were deemed admissible by the court. Those are summarized here. The individuals involved in this case are family members, sometimes share the same first or last name, and refer to each other often by nickname. To avoid unnecessary confusion, we refer to individuals here primarily by their given first names.

¶ 6     On September 16, 2004, Reginald left his home in Danville, Illinois, and drove to Chicago with his maternal uncle, Harry Wilson, to "work something out" between Reginald's younger brother, Bhushan Bradley, and Rayvonne. Reginald identified Rayvonne, who was present at the deposition, and indicated that he went by the nickname "Choo Choo." Reginald explained that Rayvonne was his cousin on his mother's side, though the two did not know each other well. Reginald testified that Bhushan, who was only 16 years old, "kept saying that Rayvonne and them was picking with him *** trying to jump on him and all sorts of stuff" and that it started "getting

2

real, real hectic," because Bhushan and Rayvonne "started bringing guns to the situation." Reginald's brother's name is spelled "Bhushan" in the court reporter's transcript of Reginald's evidence deposition, but he is referred as "Dushawn" in the affidavits referred to below.

¶ 7    Reginald testified that he and Harry arrived in Chicago that afternoon and drove to various family members' houses, finally pulling up at a house on 87th Street where Reginald's aunt Casetta lived. Casetta, Rayvonne, and "a bunch" of Reginald's cousins were standing outside the house in a circle. Reginald and Harry got out and approached the group, Rayvonne said "What's up?" to Reginald, and Harry and Rayvonne then spoke to each other. According to Reginald, Rayvonne was "real pissed off like he wanted to do something." Harry was telling him that if he had a problem with Bhushan he should just "beat his a***," but that there was no need to bring a gun into it because they were all family. Reginald said Rayvonne "wasn't trying to hear it."

¶ 8    While Harry and Rayvonne were talking, Reginald walked four or five houses away to the street corner to smoke a cigarette. He explained that he "didn't want to say nothing" to the group in front of his aunt's house and "didn't want to get into no conflict." A few minutes later, Reginald saw Rayvonne heading towards him. "So I'm thinking he's trying to go to his car or something or probably come down there to ask me something or talk to me and see what's going on," Reginald explained, but without saying anything, Rayvonne "got close up" on him, "[f]ace to face," pulled out a gun, and started shooting Reginald in the stomach. Reginald testified that Rayvonne said to him, " 'That's for your b*** a*** brother,' " and walked off "towards where [Harry] and them was." Reginald denied making any gestures towards Rayvonne or having any type of weapon or other object in his hands.

¶ 9    The next thing Reginald knew, it was "about a month or something" later, and he was waking up from a coma at Christ Hospital. He identified Rayvonne as his shooter from a photo

3

array shown to him by the police in the hospital on April 22, 2005. Reginald learned that he had been shot twice in the stomach and twice in the hand. At the time of his deposition, he was awaiting a bowel transplant, and the shooting had necessitated the amputation of one leg and the partial amputation of the other.

¶ 10    On cross-examination during the deposition, Reginald said his Uncle Harry was the one who asked him to ride with him to Chicago, and they drove in Harry's car. The reason for the trip was so Harry could pick up some clothing and a check at Reginald's grandmother's house, but also "to talk to [Rayvonne] and them *** and try to squash the situation between him and [Reginald's] brother." Reginald insisted that he did not know that his brother Bhushan had shot and killed their cousin Shabu when he arrived at the house on 87th Street and indeed did not learn that until later, when he woke up in the hospital. He acknowledged that he had spoken to Bhushan on the phone, prior to arriving at his aunt's house, but claimed that Bhushan did not say anything to him about shooting Shabu. Reginald told his brother during that phone conversation that he and Harry were in Chicago but denied making any plan with Bhushan to confront Rayvonne. He also denied that there were any guns in the car he and Harry drove in to Chicago.

¶ 11    The State's proffer of a factual basis for the plea also included the parties' stipulation that, if called as a witness at trial, Harry would testify that he was Reginald's uncle, that the two of them came to Chicago on September 16, 2004, to try to settle a family dispute involving Rayvonne and other members of their family, and that they arrived at 910 West 87th Street and saw Rayvonne gathered there with other family members. Harry would further testify that as he was talking to the family members, Rayvonne approached Reginald, pulled out a handgun, and shot Reginald in the chest area multiple times before fleeing the area.

¶ 12    Finally, the proffer included the parties' stipulation that, if called as a witness at trial, Dr.

4

Eupil Choi, an assistant medical examiner, would qualify as an expert in the field of forensic pathology. Dr. Choi would testify that two bullets were recovered from Reginald's body and, following extensive treatment, he had died of multiple gunshot wounds.

¶ 13    Rayvonne had a conviction for involuntary manslaughter in California, for which he was on parole at the time of this offense, and an unrelated first degree murder conviction in Illinois, for which the same judge who accepted the plea here had already sentenced him to 110 years. Because this was his second murder conviction, Rayvonne was eligible only for natural life in prison or the death penalty (730 ILCS 5/5-8-1(c)(ii) (West 2010)), and he indicated on the record that he wished to plead guilty in exchange for a sentence of natural life in prison. The court accepted the factual basis for the plea and concluded that it was made knowingly and voluntarily.

¶ 14                              B. Postconviction Proceedings

¶ 15    Rayvonne filed a *pro se* petition for postconviction relief on October 4, 2013, arguing that his guilty plea had not been knowingly or voluntarily made because Illinois Supreme Court Rule 402 (eff. July 1, 1997)), which establishes the admonishments a court must give before accepting a plea, was unconstitutional. The circuit court summarily dismissed the petition as frivolous and patently without merit on December 20, 2013, and we denied Rayvonne's request to file a late notice of appeal from that order on June 10, 2015.

¶ 16    Rayvonne moved for leave to file the *pro se* successive postconviction petition that is the subject of this appeal on January 15, 2019. In his petition, Rayvonne asserted a freestanding claim of actual innocence based on the affidavits of several witnesses, including Harry, who now attested that it was Reginald who drew the firearm on Rayvonne and that the gun was fired as the two struggled to gain control of it. Rayvonne also raised a claim of ineffective assistance of trial counsel that is not at issue in this appeal.

¶ 17    In his affidavit, Harry gave a far different account of what happened from what the State had proffered as a factual basis for the guilty plea. He averred that when he and Reginald arrived at the house on 87th Street, various family members were taking sides over Dushawn Bradley (Reginald's brother) having shot their cousin Dushawn Shelby (Shaboo) earlier that day. Rayvonne was defending Shaboo "in an aggressive manner," and Reginald, who was defending his brother, "felt intimidated and pulled the gun out from his back area." Harry stated that the two then "began to tussle over the gun and that's when I heard the gun shots." He explained that, immediately after the shooting, but before emergency responders arrived, Reginald pleaded "that no one tell he was the one who pulled the gun." Harry "seriously believed that [he] could have been held accountable for the shooting as well, since [he and Reginald] came to Chicago together and [Reginald] had a gun in his possession that [Harry] wasn't aware of." Harry further explained that, although he was not willing to come forward with this information before, his resentment towards Rayvonne had dissipated and "soul searching and time" had led him to conclude he needed to set the record straight.

¶ 18    Arnold Tyree McClenton averred in his affidavit that he owned the barber shop across the street from the house on 87th Street. He learned, on September 16, 2004, that "Shaboo had just been killed by his cousin Dushawn," and saw, from his shop, Shaboo's family gathering in front of the house, with various family members coming and going for about an hour. Arnold saw Reginald and Harry drive up to the house in a green Intrepid, get out, and approach the group. Arnold then described what happened next:

    "After a short while it appeared to be a commotion and Reginald the victim started to be

    very agitated and animated, he began to jump around. Rayvonne (Choo) begin to walk off

    in a haste with Reginald trailing behind him. I witnessed Reginald still appearing to be

6

arguing and throwing his hands up and around as though he was trying to challenge and get a reaction out of Rayvonne (Choo). Approximately four to five houses down, Rayvonne (Choo) stops what appeared to be any kind of back and forth argument. I witnessed Reginald pull out a gun from his back area and Rayvonne (Choo) immediately rushes Reginald and they tussle for about thirty to forty seconds until I hear a couple of shots go off rapidly in a quick succession. Reginald fell to the ground and Rayvonne (Choo) ran away."

Arnold explained that he "never wanted to get involved in this ongoing family feud" but finally felt compelled to come forward because Rayvonne's family members had given up all hope of being able to help him after he received a life sentence.

¶ 19 Andre Wilson and Tiffany Darling Brown each averred that they were part of the group of family members gathered at the house on 87th Street to mourn the death of Shaboo earlier that day. They described how Harry approached the group to ask what was going on and was told by Reginald's aunt, Casetta, that his nephew (Reginald's younger brother) had just killed her grandson. Harry said he would "whip him" (Andre's words) or "F*** him up" (Tiffany's) when he found him, and Casetta said that something more needed to happen to him than that. Reginald interjected then to say that no one was laying a hand on his brother, and he and Rayvonne got in a heated argument. Reginald pulled a gun from his waist, the two began to tussle over the gun, and shots were fired.

¶ 20 Rayvonne submitted his own affidavit giving this same account:

"I, Rayvonne got in the conversation explaining to Reginal [*sic*] that his brother was wrong and letting him know that his brother also did other things. Reginal [*sic*] did not care, the conversation got even more heated and escaladed [*sic*]. So I started walking off, as I moved

7

away from the family crowed [*sic*]. Reginal [*sic*] trailed me with more verbal conversation, acting like he was on some sort of drugs; we were about three or four houses down from my aunty's house. I stopped and stood my ground, then the next thind [*sic*] I knew he pulled a gun from his back area and I charged at him and we both fought and struggle for the gun. Shot went off and hit him in the hand and the stomach as he was falling. I ran away leaving the gun."

Rayvonne further averred that prior to his guilty plea he had mentioned these events to his lawyer and provided the names of three witnesses—Andre Shelby, Desire Shelby, and Lorenzo Dixon—who saw what happened and would testify that Reginald was shot with his own gun. Rayvonne's lawyer did not pursue this, however, because his only concern was saving Rayvonne from the death penalty by encouraging him to take a guilty plea.

¶ 21    Over the next 3½ years, Rayvonne's case was repeatedly called for status and held over again for the following week, with no discussion of or ruling on his motion to file a successive petition. On August 9, 2022, Rayvonne filed a "Motion to Compel Proceedings," in which he pointed out that no action had been taken on the motion for leave in several years. On September 19, 2022, the circuit court denied the motion for leave to file a successive petition.

¶ 22    The court concluded that none of the affidavits submitted by Rayvonne constituted newly discovered evidence because "it was all either known to [him] prior to trial or was readily discoverable prior to trial." The court noted that Rayvonne "was not only familiar with these witnesses and [they] with him, but he was also familiar with others at the scene of the shooting" because this was a family gathering and not "a random group of people." Finally, because Rayvonne himself attested that he informed his attorney of "these witnesses," the court reasoned, he "clearly could have discovered [them] prior to trial."

¶ 23    The court concluded that Rayvonne "clearly could have, through an exercise of due diligence, interviewed [Arnold,] the owner of the barbershop across the street from the shooting," and, furthermore, that "a witness is not newly discovered just because they did not want to cooperate with the defense." The court rejected Harry's assertion that he did not come forward because he feared he would also be held accountable if it was known that Reginald was the aggressor, having driven Reginald to the scene of the shooting. In the court's view, there was "no reasonable belief that the contents of [that] testimony could be used to make [Harry] accountable for the shooting" and thus "no fifth amendment basis to conclude this evidence was unavailable to [Rayvonne] prior to trial." As for Andre and Tiffany, the court pointed out that neither had offered any reason for their failure to come forward earlier or asserted that they would not have been willing to testify at a trial.

¶ 24    Rayvonne now appeals.

¶ 25                              II. JURISDICTION

¶ 26    The circuit court denied Rayvonne's motion for leave to file a successive postconviction petition on September 19, 2022. This court allowed him to file a late notice of appeal on April 14, 2023. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 606 (eff. Mar. 12, 2021) and 651(a) (eff. July 1, 2017), governing appeals from final judgments in postconviction proceedings.

¶ 27                              III. ANALYSIS

¶ 28    Rayvonne argues on appeal that the circuit court erred in denying him leave to file his successive postconviction petition because he made a colorable claim of actual innocence based on newly discovered evidence that he acted in self-defense. The legal framework and standards applicable here are well-established and are undisputed by the parties on appeal.

9

¶ 29     The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)) provides a method for a criminal defendant to collaterally attack his or her conviction by establishing that "in the proceedings which resulted in [the] conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." *Id.* § 122-1(a)(1). The Act contemplates the filing of only one postconviction petition. *Id.* § 122-1(f); *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002). Any claims that were decided on direct appeal or in an earlier postconviction proceeding are generally barred by the doctrine of *res judicata*, and any claims that could have been, but were not, raised in an earlier proceeding are forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005).

¶ 30     To file a successive postconviction petition, a defendant must obtain leave of court by establishing either "cause and prejudice" for failing to raise the claim earlier or "a fundamental miscarriage of justice based on actual innocence." *People v. Robinson*, 2020 IL 123849, ¶ 42; 725 ILCS 5/122-1(f) (West 2022). If leave to file is granted, the petition is docketed for second-stage proceedings, at which point the petitioner is appointed counsel and must make a substantial showing of a constitutional violation warranting an evidentiary hearing. *Robinson*, 2020 IL 123849, ¶ 43.

¶ 31     A petitioner who seeks leave to file a successive petition based on actual innocence must establish a "colorable claim" of actual innocence through evidence that is "(1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Id.* ¶¶ 44, 47. Such requests are reviewed under a higher standard than that applicable at the first stage of postconviction proceedings—which requires only that a petition not be frivolous or patently without merit—but under a lower standard than the substantial showing that must be made at the second stage. *Id.* ¶ 43. Leave to file should be granted if "the evidence

supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. As always at the pleading stage, "all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true," and "the court is precluded from making factual and credibility determinations." *Id.* ¶ 45. We review a circuit court's denial of leave to file a successive petition *de novo*. *Id.* ¶ 40.

¶ 32    A defendant who has pleaded guilty may still raise a claim of actual innocence under the Act. As our supreme court recognized in *People v. Reed*, 2020 IL 124940, ¶ 33, "the decision to plead guilty may be based on factors that have nothing to do with [a] defendant's guilt." Although, by pleading guilty, "a defendant waives all nonjurisdictional defenses or defects, including constitutional ones" (internal quotation marks omitted), claims of actual innocence are not traditional claims of error. *Id.* ¶¶ 27, 31. They represent neither a challenge to the sufficiency of the evidence nor to the correctness of the proceedings that led to the conviction but are instead request for "additional due process" that are "triggered by new and compelling evidence demonstrating [a] defendant's innocence." *Id.* ¶¶ 31, 40.

¶ 33    Although justice demands that such claims, where properly supported, be allowed to proceed, the *Reed* court acknowledged that a guilty plea "necessarily places the court in a different position" when a claim of actual innocence based on newly discovered evidence is asserted. *Id.* ¶ 45. "Without the developed record produced by a trial, a court cannot determine whether the new evidence sufficiently undermines the evidence presented at trial such that it would probably change the result on retrial." *Id.* It is left instead to weigh the new evidence against the defendant's voluntary and knowing admission of guilt. *Id.* ¶ 46. Because a plea of guilty is "a grave act" that should not be undone lightly, the *Reed* court concluded that at *a third-stage evidentiary hearing*

11

the burden of proof on a claim of actual innocence should be higher for a defendant who has pleaded guilty than for one who has not—clear and convincing evidence rather than a preponderance. *Id.* ¶¶ 47-48.

¶ 34 However, after our supreme court decided *Reed*, it decided *People v. Griffin*, 2024 IL 128587, ¶ 38, in which it made clear that at the leave-to-file stage, the standard for assessing a defendant's request to file a successive postconviction petition on the basis of actual innocence is the same, whether there was a guilty plea or a trial. "In assessing whether a petitioner has satisfied the low threshold applicable to a colorable claim of actual innocence, the court considers only whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on retrial." *Id.* ¶ 40 (citing *Robinson*, 2020 IL 123849, ¶ 60).

¶ 35 With these principles in mind, we consider the parties' arguments.

¶ 36 A. The State's Forfeiture Argument

¶ 37 We first address the State's argument that Rayvonne is barred from raising an actual innocence claim based on a defense that he never asserted below. Although at oral argument in this court the State backed away from the label "forfeiture," that is what it argued in its brief. While the State recognizes that, after our supreme court's decision in *Reed*, a guilty plea is no bar to a successive postconviction claim of actual innocence, it contends that the failure to assert a defense to the crime for which a defendant pleaded guilty may still result in forfeiture.

¶ 38 The State relies for this argument on *People v. Montes*, 2015 IL App (2d) 140485, ¶ 19, where this court held that a defendant had forfeited an actual innocence claim based on the defense of entrapment by failing to raise that defense at trial, on direct appeal as a failure of his trial counsel, or as the basis for a claim of ineffective assistance of appellate counsel. *Montes* did not involve a guilty plea but a trial *in absentia*. *Id.* ¶ 1. More importantly, *Montes* was decided before our

supreme court's decision in *Reed*, and the State has made no effort to reconcile the two. Indeed, this court has been unable to do so.

¶ 39    Just last year in *People v. Mendoza*, 2024 IL App (1st) 231588, ¶¶ 34, 36, we called the *Montes* court's reasoning "flawed" and questioned whether, after *Reed*, forfeiture was a concept that could even be applied to claims of actual innocence. We also noted that *People v. Fleming*, 50 Ill. 2d 141 (1971), and *People v. Davis*, 2014 IL 115595, the two cases the *Montes* court relied on, did not involve claims of actual innocence. Because "[t]he essence of an actual innocence claim is that the evidence in question is new and could not have been discovered sooner," we reasoned, finding such a claim to be forfeited "would obliterate the very purpose of actual innocence claims." *Mendoza*, 2024 IL App (1st) 231588, ¶ 35. We agree with this analysis, decline to apply *Montes* to these facts, and find no forfeiture here.

¶ 40            B. Whether Rayvonne Made a Colorable Claim of Actual Innocence

¶ 41    We now turn to the merits. Has Rayvonne established a colorable claim of actual innocence through evidence that is (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result in this case?

¶ 42    "Evidence is material if it is relevant and probative of the petitioner's innocence," and noncumulative if it "adds to the information that the fact finder heard at trial" or, in this case, that was part of the evidence proffered in support of the guilty plea. *Robinson*, 2020 IL 123849, ¶ 47. The State concedes that, when taken as true, the affidavits submitted in support of Rayvonne's successive postconviction petition constitute material and noncumulative evidence.

¶ 43    The State argues that we should affirm the circuit court's denial of Rayvonne's motion, however, both for the reason the circuit court gave—that the evidence is not newly discovered— and for the additional reason that it is not of such a conclusive character that it would probably

change the result in this case. We consider each contention in turn.

¶ 44        1. *Whether the Affidavits Constitute Newly Discovered Evidence*

¶ 45    "Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence." *Id.* It is the petitioner's burden to show that there was no lack of due diligence. *People v. Snow*, 2012 IL App (4th) 110415, ¶ 21.

¶ 46    The State initially insists that because Rayvonne was himself aware that he acted in self-defense, no evidence later coming to light that tended to prove that fact could ever be considered newly discovered. In support of this argument, it quotes *People v. Jarrett*, 399 Ill. App. 3d 715, 723 (2010), for the oft-repeated proposition that "evidence is not 'newly discovered' when it presents facts already known to a defendant at or prior to trial, even if the source of [those] facts may have been unknown, unavailable, or uncooperative." We granted the State leave to file a motion bringing to our attention another case, *People v. Walker*, 2024 IL App (1st) 232223-U, ¶ 22, as supplemental authority for that same proposition. If the proposition these cases are cited for were the unqualified law, however, it is difficult to imagine what evidence of actual innocence could ever be considered newly discovered. An innocent defendant always *knows* he is innocent. It is evidence tending to prove that fact, and not the fact itself, that can form the basis for a postconviction claim of actual innocence.

¶ 47    We noted in *People v. Brown*, 2020 IL App (1st) 190828, ¶ 60, that this understanding, as espoused in *Jarrett*, of what it means for evidence to be "newly discovered" has been "significantly called into doubt" by our supreme court's decision in *People v. Edwards*, 2012 IL 111711. The *Edwards* court concluded that a codefendant's affidavit constituted newly discovered evidence because, although the defendant was surely aware of him as a potential witness, the codefendant

14

would have invoked his fifth amendment right to avoid self-incrimination if called to testify at trial for the defense. *Id.* ¶ 38. Because no amount of diligence on the defendant's part could have forced his codefendant to violate that right if he chose not to do so, the information he later disclosed in an affidavit was indeed newly discovered. *Id.* Following *Edwards*, there can be no doubt that we look to whether the evidence, testimony, or witness in question is newly discovered, not whether any facts that such evidence tends to establish were already known to the defendant.

¶ 48    Of course, this does not mean that any new evidence, testimony, or witness that supports a defense that the defendant presented or could have presented at trial will give rise to an actual innocence claim. In fact, as the court's decision in *Walker* illustrates, this "new" evidence must still meet the other two elements of an actual innocence postconviction petition—it must be material and noncumulative and of such a conclusive nature that it probably would have changed the outcome of the case. What this court did in *Walker*, while citing the requirement that the evidence be "newly discovered," was put that evidence alongside what had been presented at trial and decide that it would not have made a difference. *Walker*, 2024 IL App (1st) 232223-U, ¶¶ 12, 23. We concluded that additional witness testimony stating that the victim was pointing a gun at the defendant would probably not have changed the outcome where other witnesses, including the defendant himself, had already given that same account at trial. *Id.* ¶ 23. That is an assessment of the conclusive nature—the impact—of the evidence, not its newness.

¶ 49    We agree that is the way the proffered new evidence here should also be assessed, but we reserve our consideration of whether the outcome would be changed for our assessment of the conclusive nature of that evidence, below. The affidavits here are newly discovered if the witness accounts contained in them were not available to Rayvonne at the time of his guilty plea and, through no lack of due diligence on his part, could not have been obtained and presented at a trial.

See *Robinson*, 2020 IL 123849, ¶ 47. We will examine that requirement first and then, if it is met, separately consider whether the newly discovered evidence is of a sufficiently conclusive nature.

¶ 50    The circuit court concluded that all four affidavits were not newly discovered because, in support of his claim of ineffective assistance of trial counsel, Rayvonne averred in his own affidavit that he told his lawyer about certain witnesses who could testify that Reginald, and not Rayvonne, was the aggressor. The court concluded then, that Rayvonne "knew of *these witnesses* and informed his attorney of *these witnesses*." (Emphases added.) That was incorrect. The individuals mentioned in Rayvonne's affidavit—Andre Shelby, Desire Shelby, and Lorenzo Dixon—are not the same witnesses who have now provided affidavits in support of his actual innocence. Nothing Rayvonne said in his affidavit clearly contradicts his assertion that these witness accounts were not available to him at trial.

¶ 51    The burden remains on Rayvonne to demonstrate that the prior unavailability of these witness accounts was not due to his own lack of due diligence. There is limited law, either cited by the parties or that has been discovered by the court, as to what diligence is "due" where, as in this case, there was no trial but a guilty plea. Surely parties to a guilty plea are not expected to conduct the sort of full investigation of potential witnesses that would have been necessary had the case gone to trial. However, in this case, since it is clear that at least one witness would not have been available no matter how much effort was expended, we will analyze this issue in line with how we would analyze it had there been a trial.

¶ 52    Two of the witnesses—Andre Wilson and Tiffany Darling Brown—present a clear case. Rayvonne offers no explanation at all for why they would have been unavailable at a trial. Nor can any such reason be gleaned from their affidavits. Appellate counsel wisely chose not to focus on these two affidavits at argument in this appeal, and we agree with the State that Rayvonne has not

established that they are newly discovered.

¶ 53    The barber, Arnold Tyree McClenton, is a close case. The circuit court believed that Rayvonne "clearly could have, through an exercise of due diligence, interviewed the owner of the barbershop across the street from the shooting." Rayvonne points out that nothing in Arnold's affidavit suggests that his presence inside the barbershop was known to Rayvonne or to anyone else who was on the other side of the street that day. The situation is not unlike that in *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009), where our supreme court held that an eyewitness account was newly discovered because the witness, though present at the scene, was standing in a location "where he would not have been seen by [the] defendant." We need not precisely delineate what Rayvonne, a defendant who pleaded guilty, must show to establish no lack of due diligence in obtaining this account, however, because it is clear to us that the fourth affidavit could not have been obtained earlier through due diligence, even by a defendant whose counsel engaged in a full investigation in anticipation of a trial.

¶ 54    Harry Wilson was the State's star eyewitness. The State's proffer was that his testimony would corroborate the account Reginald gave in his evidence deposition in all respects. Harry would testify that Rayvonne approached Reginald with a gun in his hand as Reginald was talking to family members, shot at him multiple times, and fled. The affidavit attached to the postconviction petition unequivocally recants that proffered testimony and makes clear that Reginald was the aggressor and the one with the gun.

¶ 55    The State acknowledges that "all indications in the record are that any due diligence petitioner exercised with respect to Harry resulted in petitioner's acceptance that Harry would testify against him," and yet it insists that Rayvonne has not shown that he diligently tried to somehow miraculously get Harry to change his testimony. Since the State nowhere suggests what

appropriate path Rayvonne or his lawyer might have taken to persuade the State's eyewitness to change his testimony, we cannot accept the State's contention that there was an absence of diligence.

¶ 56    We also disagree with the State and the circuit court that Harry's explanation that he feared telling the truth because he might be charged as an accomplice in this shooting must be rejected. Reginald testified at his deposition that it was Harry who asked Reginald to come to Chicago, that they drove there in Harry's car, and that it was Harry's idea to get involved in the family dispute going on there. Contrary to the circuit court's dismissive comments, we conclude that it would in fact be quite reasonable, under these circumstances, for Harry to fear the State might bring criminal charges, and thus reasonable for Rayvonne to doubt that he could convince Harry to testify for the defense. See *Edwards*, 2012 IL 111711, ¶ 38 (concluding, where the new witness was a codefendant with a fifth amendment right to avoid self-incrimination that "[n]o amount of diligence could have forced him to violate that right if he did not choose to do so"). In short, it is clear to us that Harry, as a witness for the defense, meets the requirement of being newly discovered.

¶ 57        2. *Whether the New Evidence Is of a Sufficiently Conclusive Character*

¶ 58    Because we are also convinced that Harry's affidavit alone is enough to establish a colorable claim of actual innocence, we may disregard, for the moment, Arnold's affidavit, which is arguably also newly discovered and also strongly supports Rayvonne's defense, as Arnold is presumably a neutral witness who would also say that Reginald was the aggressor.

¶ 59    In assessing the conclusive nature of this new evidence, it is important to keep in mind that we are only at the leave-to-file stage. As our supreme court has made clear, at this stage, we consider, "only whether the new evidence, if believed and not positively rebutted by the record,

18

could lead to acquittal on retrial." *Griffin*, 2024 IL 128587, ¶ 40. The only requirement at this stage is that this new evidence "raise the probability that it is more likely than not that no reasonable [trier of fact] would have convicted." *Id.* ¶ 55. If Rayvonne makes it to a third-stage evidentiary hearing, he will have the higher burden of showing that the newly discovered evidence is sufficient to overcome the guilty plea by clear and convincing evidence. *Reed*, 2020 IL 124940, ¶ 49.

¶ 60    The relatively low bar justifying leave to file is met here. To prove its case on the charges that Rayvonne pleaded guilty to, the State would have had to demonstrate beyond a reasonable doubt that *without lawful justification* Rayvonne caused Reginald's death while either intending to kill or do great bodily harm or with the knowledge that his actions would cause death. 720 ILCS 5/9-1(a)(1) (West 2004). "Legally justified self-defense is the use by a nonaggressor of such force as that person reasonably believes is necessary for self-protection against another person's threatened, imminent, and unlawful force." *People v. Robinson*, 163 Ill. App. 3d 754, 761 (1987). "Even a slight amount of evidence is sufficient to raise the issue of self-defense (*People v. Jaffe*, 145 Ill. App. 3d 840, 852 (1986)), and "once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense" (*People v. Lee*, 213 Ill. 2d 218, 224-25 (2004)).

¶ 61    Harry's affidavit is a recantation by the State's sole living eyewitness that gives an entirely different account of the shooting than the one presented in support of Rayvonne's plea. Harry explains that it was Reginald who approached Rayvonne with a gun drawn, not the other way around, that Rayvonne rushed at Reginald and "tussled" with him, and that the gun went off during that physical encounter.

¶ 62    The State points out that a trier of fact could not tell from this what precisely caused the gun to fire, but a trier of fact could certainly infer from the affidavit, taken as true, that Rayvonne

19

either obtained control of the gun and shot Reginald in self-defense or that he acted in self-defense to *try* to gain control of the gun and the gun then went off accidentally during the struggle. See *Robinson*, 163 Ill. App. 3d at 768 (noting that although a shooting occurring as a result of a struggle was accidental, "the preceding events could [still] place the shooting in the context of self-defense" (internal quotation marks omitted)). Harry describes in his affidavit a situation in which Rayvonne would reasonably have feared for his life and been justified in attempting to wrest control of the gun from Reginald and, regardless of how, precisely, the gun was discharged, a trier of fact could acquit him of murder based on the averred facts.

¶ 63    Harry also offers an explanation in his affidavit for why this new account differs from his earlier proffered testimony and from Reginald's deposition testimony—Reginald pleaded with witnesses, before he was taken to the hospital, to lie and say that Rayvonne had the gun and was the aggressor. This not only explains Harry's earlier version but undermines the veracity of Reginald's deposition testimony, in which he portrayed himself as a victim, rather than an aggressor.

¶ 64    At this stage, where the only question is whether new evidence, if believed, "could lead to acquittal on retrial" (*Griffin*, 2024 IL 128587, ¶ 40), we conclude that this third element is met and that leave to file should have been granted here.

¶ 65                                  IV. CONCLUSION

¶ 66    For all of the above reasons, we reverse the circuit court's denial of Rayvonne's motion for leave to file a successive postconviction petition and remand for second-stage proceedings.

¶ 67    Reversed and remanded.

---

*People v. Wilson*, 2025 IL App (1st) 230027

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 05-CR-20231; the Hon. Kenneth J. Wadas, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Tiffany Boye Green, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Amy M. McGowan, and Zach Van Duyn, Assistant State's Attorneys, of counsel), for the People. |

---