2025 IL App (1st) 240582

First District
Third Division
December 3, 2025

No. 1-24-0582

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
|  | ) | of Cook County. |
| Plaintiff-Appellee, | ) |  |
|  | ) | No. 22 CR 09320 01 |
| v. | ) |  |
|  | ) | The Honorable |
| LARONE WILLIAMS, | ) | Alfredo Maldonado, |
|  | ) | Judge Presiding. |
| Defendant-Appellant. | ) |  |
|  | ) |  |

JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Lampkin and Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1 After a jury trial, defendant Larone Williams was convicted of aggravated battery (720 ILCS 5/12-3.05 (West 2022)) and was sentenced to two years and six months in the Illinois Department of Corrections. On appeal, defendant claims that his conviction should be reversed outright, where the State failed to disprove his affirmative defenses of self-defense and defense of others beyond a reasonable doubt. In the alternative, defendant contends that his conviction should be reversed and the matter should be remanded for a new trial, where the trial court (1) improperly instructed the jury and (2) polled only 11 of the 12 jurors. For the reasons set forth below, we affirm.

¶ 2 BACKGROUND

¶ 3 During the overnight hours of July 22, 2022, defendant was a passenger on a southbound Chicago Transit Authority (CTA) Red Line train that was stopped at the North/Clybourn

station. Several train cars away on the same Red Line train, Daniel Beam, also a passenger, was the victim of an attempted robbery in which a group of offenders sought to steal his cell phone. During the encounter, Beam pulled out a pocketknife and stabbed one of the offenders in the back, after which they fled.

¶ 4       While they were passing through the train cars, the group informed other passengers that someone on the train had stabbed one of them and requested assistance. In response, Vernon Holman decided to stop the perpetrator. Holman moved through the train until he reached the train car in which Beam was standing, blocking the door. Beam, recognizing that Holman was not part of the group that had attempted to rob him, permitted Holman to enter the train car. As Holman was passing Beam, however, he tackled Beam. In response, Beam, who was still holding the knife, slashed at Holman with the knife, cutting his neck.

¶ 5       By this point, the group that had attempted to rob Beam had arrived at the train car in which defendant was sitting, informing him of the stabbing. Like Holman, defendant decided to stop the perpetrator and, holding a bottle of alcohol from which he had previously been drinking, defendant began moving through the train in search of Beam. On his way, he encountered Holman, who was bleeding from the neck from his interaction with Beam. Defendant eventually discovered Beam. After a brief chase during which defendant was on the train platform and Beam moved through the train cars, defendant finally encountered Beam in the doorway of one of the train cars. Beam, inside the train, faced defendant, who was on the platform, while Holman and another passenger, who had followed Beam, stood near him inside the train. Beam lunged at defendant twice with his knife. In response, defendant, who was still holding the bottle, swung it at Beam, striking him. The chase then continued, with Holman, defendant, and the other passenger attempting to subdue Beam, resulting in both Beam and

defendant sustaining injuries. Eventually, Beam exited between two train cars and fled to a workers' access ledge on the far side of the tracks from the platform.

¶ 6    Defendant, Holman, and three other individuals involved in the incident were all arrested and charged; Beam was not charged with any offenses. Defendant and Holman, both of whom were charged with aggravated battery and armed robbery, were tried together before a single jury, while Martinez Owens, one of the individuals who had attempted to rob Beam, was tried simultaneously before a separate jury.[1] The evidence at trial included the following.

¶ 7    *Daniel Beam*

¶ 8    Beam testified that on July 22, 2022, at approximately 1:45 a.m., he was a passenger on a southbound Red Line train, sitting alone in a quiet, "kind of empty" train car. When the train arrived at the Belmont stop, Beam observed a large number of people on the platform, waiting to board; most of the group entered the train car adjacent to his, but a few entered his train car before walking through the train to meet the rest of the group. One of the men fist-bumped Beam as he passed. The ride was uneventful until shortly after the Fullerton stop. Beam was in his seat, looking at his phone, when he heard the internal doors between the train cars open. He looked up and observed two individuals, one wearing a balaclava covering his face, approaching him. As they reached him, the individual wearing the balaclava attempted to take Beam's phone out of his hand. Beam's natural inclination was to pull it back, and the two struggled for a short time before the second individual joined in, threatening Beam if he did not release the phone. At trial, Beam identified the second individual as codefendant Owens.

---

[1]The remaining two defendants, LaToya Thomas and Shawn Gullens, entered guilty pleas prior to trial. In addition, the trial court granted defendant's and Holman's motions for a directed verdict concerning the armed robbery count, so we focus on the facts underlying the aggravated battery charges.

¶ 9       The three struggled for approximately 30 seconds before Beam was thrown to the floor, causing him to drop his phone, and Owens kicked him in the face. Beam "immediately knew *** that this had gotten very serious" and pulled out a knife he had in his pocket, which he described as a fixed-blade knife with a two-inch blade. He lunged forward toward Owens, who had taken a step away after kicking Beam, and stabbed him in the back. Owens and the other individual returned to the train car from where they had originally come, while Beam moved in the opposite direction to the next train car, still holding the knife. When he reached the next train car, Beam called 911 to report the attempted robbery and pressed the train's emergency call button to inform the operator of the attack. While on the phone, Beam kept watch on the doors, in case anyone tried to follow him. He observed someone approaching, so he placed his foot against the door to prevent it from opening. After approximately a minute, he stepped back and let the individual through, as he did not appear angry and was older than the group that had attacked him, so Beam believed he posed no threat. At trial, Beam identified the individual as codefendant Holman.

¶ 10      After letting Holman through, Beam turned his back and began walking toward the center of the train car. Without warning, Holman ran up to Beam and grabbed him, throwing him to the ground. Beam, who still held the knife in his hand, struck Holman in the neck and head with the knife. The train stopped at about that time at North/Clybourn, an underground stop, and Holman exited the train. Beam, who was still on the phone with 911, exited the train after a few moments, trying to determine if he would be able to make it up the stairs to leave without again being attacked. When he stood on the platform, he observed a man, whom he identified in court as defendant, holding a glass liquor bottle in his hand; Holman, who was now brandishing a knife; and a woman, later identified as LaToya Thomas, and "realized people

4

were pursuing me." Beam reentered the train, running through one or two train cars, and defendant pursued him. Beam eventually exited the train again, looking for the stairs to exit. Immediately upon his exit from the train, defendant struck him in the face with the bottle in his hand, and Holman stabbed him in the clavicle. Beam again entered the train and ran through the train cars until he secluded himself in a vestibule at the end of one of the train cars, where there were doors he could close; defendant and Holman were still pursuing him. At some point, his bag fell to the ground, and Thomas took it. Eventually, Beam was able to exit the train between two train cars, where he jumped over the third rail and onto the workers' access ledge, then ran down the ledge into the subway tunnel. Once he observed police on the platform, he moved to the platform, where he was escorted to ground level and his injuries were treated before being taken to the hospital. At the hospital, he received further treatment for his injuries, which included a laceration on his forehead that required 15 stitches; a laceration on the back of his head that required 10 to 12 staples; a stab wound near his clavicle that required stitches; bruises and abrasions all over his body; and fractures of the orbital bones, nose, forehead, and back of the head.

¶ 11    On cross-examination, Beam testified that, when he was exiting the train and encountered defendant, he "definitely would have been brandishing [his] knife to try to keep people at a distance." Beam further admitted that he had initially informed police that a woman hit him in the head with a bottle.

¶ 12                                *Vernon Holman*

¶ 13    Holman testified that, at approximately 2 a.m. on July 22, 2022, he was a passenger on a Red Line train, traveling in a train car containing a large number of people. During the train ride, a young man fell through the doors with a stab wound to his back; Holman did not

5

previously know the man. Upon observing him, Holman "tried to go play hero" by attempting to locate the individual who had stabbed the man. Holman walked through the doors to the next train car but did not observe anything amiss. He continued to the next train car, where Beam was holding the doors to prevent Holman from entering. Holman asked Beam to release the door so that Holman could enter, and Beam did so. Holman walked through the door and observed that Beam was holding a knife, which appeared to have blood on it.

¶ 14      When he observed the knife, Holman concluded that Beam was the person who had stabbed the young man and "[o]nce again tried to play hero, reached out to him with my bare hands and tried to take him down." While Holman was carrying a knife in his pocket, he did not pull out his knife to subdue Beam, as he "[w]asn't trying to hurt no one." Beam, however, was "quite a bit" taller and heavier than Holman, so "[h]e took [Holman] down" instead. Beam then stabbed Holman in the neck and back of the head. The train doors opened, and Holman fell onto the train platform, where he requested that a CTA employee call an ambulance. Beam also exited the train, still holding the knife, and walked in Holman's direction. When Holman observed Beam coming his way, Holman pulled the knife from his pocket, as he felt that Beam posed a threat to Holman and to others. Beam approached, and he and Holman struck at each other with their knives before Beam ran back onto the train. "[A] lot of people" began chasing after Beam, and the altercation ended by Beam climbing through the car doors to jump onto the platform and leave. Holman sat on a bench, waiting for paramedics, and was eventually taken to the hospital, where he remained for seven days.

¶ 15                                        *Defendant*

¶ 16      Defendant testified that, at approximately 1:50 a.m. on July 22, 2022, he was a passenger on a Red Line train traveling southbound when the train stopped, which defendant initially

6

believed was due to a delay. He heard someone calling for help in the distance but paid little attention until three "kids," approximately ages 18 to 21, came into the train car asking for help, as one of them had been stabbed. Defendant rose and began walking in the direction from which they had come, holding a bottle of alcohol that he had been drinking. As defendant walked through the train cars, he asked other passengers if they had any information about the stabbings, but they did not. Eventually, defendant came across Holman, who had been stabbed in the neck. Defendant, who was on the train platform at the time, observed Holman sitting inside one of the train cars, where several people were attempting to render aid; defendant could observe blood "squirting" from his neck.

¶ 17    After encountering Holman, defendant continued walking down the train platform "towards the direction where I felt everything was going on" and ultimately encountered Beam, who was holding a knife in his hand and was "jittery, moving back and forth pacing." Defendant "wanted to *** make sure no one else got hurt," so he drew closer to Beam to ensure that he did not stab anyone else. Beam ran into the train car, and defendant attempted to follow but could not pass through the car due to the presence of other passengers. Defendant ran on the platform to the car's other door. As defendant attempted to enter the train car, Beam "instantly lunged at me with the knife." Defendant leaned away when he observed Beam lunge the first time, then Beam "came full force with it towards my chest," so defendant swung the bottle he was carrying toward Beam's knife hand so he would not be stabbed. Defendant testified that the bottle "probably skinned his hand, but it didn't hit him."

¶ 18    After defendant swung the bottle, it fell to the ground and broke; Beam still held the knife in his hand. Beam continued moving toward the front of the train with "a mean look to his face," so defendant attempted to stay in proximity to him, "making sure no one else got hurt."

7

Defendant followed him through the train cars, and defendant heard Holman state that Beam had stabbed him, then Holman approached Beam and attempted to remove the knife from his hand while Beam tried to stab him several times. Defendant pulled Holman away from Beam, and Beam stabbed defendant in the process.

¶ 19     Everyone eventually exited the train car, with defendant being the last to exit. He waited on the platform until police arrived, then approached them and attempted to explain the incident to them, but they were not listening. Once defendant went upstairs to ground level, he was handcuffed.

¶ 20                                                     *CTA Video*

¶ 21     In addition to their testimonies as to the events of July 22, 2022, Beam, Holman, and defendant all testified concerning video evidence depicting the incident. Police obtained CTA surveillance video from several of the train cars,[2] as well as video of the platform, and the videos were admitted into evidence and published to the jury during the trial. The videos from the train each depict the interior of a CTA train car from four angles: one from each end of the train car, as well as one from near each of the two train doors. In train cars containing a vestibule area at one of the ends, there are additional camera angles from that view.

¶ 22     The videos largely corroborate the testimonies of all three men. At the beginning, Beam is sitting in a train car; the rest of the car is relatively empty, with only three other individuals visible in the video, none of whom are sitting near Beam. The train doors open, and four individuals enter, all of whom pass through the car and walk into the next car via the interior door closest to Beam. As one of the men passes Beam, he gives Beam a fist bump. One of the

[2]Detective Anthony Gracia testified that he walked through the train and requested video from all train cars in which he observed suspected bloodstains. There is no video from the train car in which defendant was sitting when he was first alerted to the stabbing.

8

individuals entering the train car is Holman, who enters last and does not interact with anyone on his way to the next train car. The train reaches the next stop, and one person enters the train and sits in the car.

¶ 23    Almost immediately after the doors close and the train resumes its route, the interior door closest to Beam opens, and Owens and another man come through the door. Owens looks at Beam while walking past him, while the other man, whose head is covered, reaches toward Beam and attempts to grab something from him. Beam rises and struggles, while Owens returns and joins in the altercation. At one point, Beam is thrown to the floor, as another two individuals enter the train car through the interior door. The man who initially grabbed at Beam attempts to kick Beam, who manages to extricate himself and stand up—the distance between Beam and the others is the width of the main train doors. The men turn to walk away, back to the other train car, and Beam takes two steps toward them and lunges, striking Owens—who is the last one in the group—in the back. Beam then walks the length of the train car and goes through the interior doors to the next car.

¶ 24    The video from the other train car—where the group had gone—depicts Holman inside the train car prior to the attack. Owens and the other man leave the train car and enter the next car through the interior door. Shortly thereafter, the occupants of the train car, including Holman, look in the direction of the door and begin to move toward it. The door opens, and the group who had been involved in the attack on Beam enters in a rush, and Owens collapses on the ground at the far end of the train car. Holman walks toward him, then turns and walks in the direction of the train car from which they had come.

¶ 25    Less than a minute after the altercation ended, the video depicts Holman entering the train car, followed by one of the individuals who had joined the group while Beam was being

attacked. Holman walks through the train car and approaches the interior doors on the far side—the one that Beam had gone through—while the other man runs back to the previous car. Holman attempts to open the door and, after several attempts, the door opens. Shortly thereafter, the train stops at the next stop, and the main train doors open.

¶ 26    The video from the inside of that train car depicted Beam entering the car through an interior door, shortly after being attacked, then standing near the door. The train car is mostly empty, with a handful of passengers inside. Beam looks through the door, then makes a phone call. He also speaks briefly to another passenger, then presses a button near one of the main train doors. While on the phone, he continues to look through the door from which he entered. Approximately a minute after Beam entered the train car, movement can be observed behind the door. Beam stands near the door for several seconds, then walks away—still on the phone—while the door behind him opens and Holman enters. Beam moves to the side, close to the main train doors, and as Holman passes by him, Holman grabs Beam by both shoulders. Beam and Holman wrestle, while the train stops at the next stop and the doors open; at points during the altercation, Beam appears to make a stabbing or slashing motion. When the doors open, Holman exits the train while Beam remains inside, pacing the length of the train car for approximately 30 seconds before exiting the train through the far door.

¶ 27    The video from the platform depicts Holman exiting the train and pacing in front of the train car; there is someone who appears to be a CTA employee nearby. Shortly thereafter, Beam exits the train and addresses the CTA employee, pointing at Holman. The three appear to have a discussion, with Holman and Beam standing some distance away from each other, before Beam walks back in the direction of the train. As he does, defendant can be observed exiting a train car further down and walking toward Beam, holding a bottle in his hand. The

video from the train car that defendant exits indicates that this car was the initial car in which Beam was attacked. Approximately one minute after Holman had passed through the door to meet Beam, defendant entered the train car through the interior car doors that the group had earlier gone through and walked the length of the train car, speaking with one of the individuals sitting in the train car before exiting through one of the main train doors.

¶ 28    Beam, on the platform, enters the train through one set of doors, almost immediately followed by defendant entering through the train car's other doors. Beam then exits the train, followed by defendant. As defendant follows Beam, Holman, clutching his neck, follows as well. A few seconds later, Beam comes back down the platform, followed by defendant and Holman. Holman appears to be holding a knife in his hand and is waving it at Beam. Beam stands against the wall, while defendant and Holman are in front of him on either side, and Thomas exits the train and stands in between defendant and Holman. Beam runs past Holman, down the platform, and the three follow, followed by a fourth individual.

¶ 29    Beam enters the train through one door, followed by Holman and Thomas, while defendant walks along the platform, looking inside the train. Beam runs to the other door. As he turns to exit the train, he lunges forward, then steps backward, turning slightly to face the center of the train. He looks at Holman and Thomas, then turns back toward the door and runs through it, holding his right arm—in which he is holding his knife—at his shoulder as though preparing to strike. The video from the platform depicts defendant pausing outside the door, then leaning back; his right arm, which is holding the bottle, swings backward slightly. He rights himself, then leans back again as Beam exits the train, lunging directly at defendant while holding the knife outstretched. Defendant swings the bottle at Beam, appearing to hit Beam's arm. Beam

runs toward the wall, with Holman, Thomas, and defendant following. Beam has his arm outstretched, waving his knife, and Holman similarly extends his arm and waves his knife.

¶ 30    Beam runs toward the train, with Holman, Thomas, and defendant following, and enters a train car. He runs toward the vestibule area, with the three—plus several more individuals—following. Beam attempts to open the door, while the others attempt to stop him, and he eventually escapes.

¶ 31                    *Jury Instructions*

¶ 32    As relevant to the issues on appeal, during the jury instruction conference, the State tendered an instruction concerning the use of self-defense by an initial aggressor (the provocation instruction). With respect to defendant, the State contended that the evidence established that no contact had been made between Beam and defendant prior to defendant's actions, making defendant the initial aggressor for the purposes of the aggravated battery. Defense counsel objected, noting that the video evidence depicted that Beam swung his knife twice at defendant prior to defendant's use of the bottle. Defense counsel also contended that, as one of the theories of defense was that defendant was acting in defense of others, the evidence established that defendant did not initiate any type of violent conduct—the violence was initiated when Beam stabbed Owens in the back. The trial court permitted the instruction over counsel's objection.

¶ 33    When instructing the jury, the trial court began by giving instructions applicable to both defendants. The trial court then gave separate instructions concerning the elements of aggravated battery with respect to each defendant, as Holman was charged with aggravated battery for "caus[ing] bodily harm to another person" and defendant was charged with aggravated battery for "making physical contact of an insulting or provoking nature with

12

another person." Each of these instructions expressly named the defendant for whom it was applicable. Similarly, the trial court gave separate instructions concerning the propositions the State was required to prove with respect to each charge, again expressly naming the defendant to whom the instruction applied.

¶ 34    After setting forth these instructions, the trial court then gave two instructions concerning self-defense/defense of others and provocation. First, the trial court instructed:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against the imminent use of unlawful force. However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another."

The trial court then instructed:

"A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes that he is [in] imminent danger of death or great bodily harm and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person."

¶ 35    During jury deliberations, after approximately an hour and a half, the jury sent two notes to the trial court. The first note asked whether the pages of the jury instructions could be printed with page numbers. The second note consisted of a copy of each of the above-quoted instructions, with a similar question handwritten on each: "Who does this apply to?" and "Who

13

does this definition apply to?" The instructions also had certain words underlined or circled.[3]

The trial court indicated that "I think they are asking does the instruction apply just to the

defendants or who does it apply to," but the court permitted counsel some time to examine the

note and suggest a possible response.

¶ 36        Defendant's counsel suggested that, with respect to the provocation instruction, "I believe

the jury should be instructed that this should be applied to whoever they believe initially

provoked the use of force" and that, with respect to the self-defense instruction, "I would ask

that they be instructed that this applies to the defendants." In the alternative, defendant's

counsel suggested that the provocation instruction "would apply to the defendants if you

believe they initially provoked the incident." The State, however, argued that, because these

instructions concerned affirmative defenses, "[n]either of these would apply to Daniel Beam

or to anyone else as a person who initially provokes. That wouldn't apply to anyone other than

the defendants because it is a self-defense instruction." Accordingly, the State requested that

"you send back the note indicating it would apply to the defendants." The trial court ultimately

determined that its response to the jury's notes would be:

> "Your attached instructions are to be considered only as to the defendants—plural—
>
> alleged conduct and as to whether the State has proven their allegations against the
>
> defendants.

---

[3]As an example of the type of underlining in the instructions, the first sentence of the self-defense instruction was annotated as follows: "A person is justified in the use of force when and to the extent that he *reasonably believes* that such *conduct* is *necessary* to defend himself or *another against* the imminent use of unlawful force." (Emphases in original.) We observe that, apparently subsequent to the notes sent to the trial court, the jury further annotated the two instructions, writing "Holman" at the top of the self-defense instruction and "Williams" at the top of the provocation instruction. In addition, the provocation instruction also has a checkmark next to the first proposition (concerning the presence of danger of death or great bodily harm) and an X next to the second proposition (concerning the exhaustion of every reasonable means to escape the danger).

As to page numbers, you have received the instructions in their current condition. No page numbers will be given. Please continue your deliberations."

¶ 37    The jury continued deliberating for approximately three and a half hours, then returned its verdicts. The jury found Holman not guilty of aggravated battery but found defendant guilty of aggravated battery. Defendant's counsel requested to have the jury polled, and the trial court did so but polled only 11 of the 12 jurors.

¶ 38    *Posttrial Motion and Sentencing*

¶ 39    Defendant filed a posttrial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. As relevant to the instant appeal, in his motion, defendant contended that the State failed to prove him guilty beyond a reasonable doubt and that the trial court erred in instructing the jury. Specifically, defendant maintained that the provocation instruction should not have been given and that the trial court should have provided an explanation to the jury concerning the applicability of the instruction in response to the jury note. Defendant claimed:

> "This confusion was further illuminated by *** the foreperson, who after completion of the trial and announcement of the verdict, spoke to counsel for [defendant] and explained that they believed [the self-defense instruction] applied only to Co-Defendant Vernon Holman and *not* to [defendant], thus leading the jury to believe that [defendant] was not entitled to self-defense according to the law. Additionally, [the juror] explained the jury believed that [the provocation instruction] applied only to [defendant] and *not* to Mr. Holman. Thus, the jurors misunderstood that *all* instructions applied to both Defendants, and more importantly, left [defendant] without the benefit

15

of fully considering how the defense of self-defense applied to [defendant]." (Emphases in original.)

¶ 40    Defendant's posttrial motion was denied, and the matter proceeded to sentencing, where the trial court sentenced defendant to two years and six months in the Illinois Department of Corrections, followed by six months of mandatory supervised release. Defendant timely filed a notice of appeal, and this appeal follows.

¶ 41                                    ANALYSIS

¶ 42    On appeal, defendant claims that his conviction should be reversed outright where the State failed to disprove his affirmative defenses of self-defense and defense of others beyond a reasonable doubt. In the alternative, defendant contends that his conviction should be reversed and the matter should be remanded for a new trial where the trial court improperly instructed the jury and polled only 11 of the 12 jurors. We consider each argument in turn.

¶ 43                                *Affirmative Defenses*

¶ 44    Defendant first contends that the State failed to disprove his affirmative defenses beyond a reasonable doubt. When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The same standard applies when determining whether the State proved that the defendant did not act in self-defense. *People v. Coleman*, 2023 IL App (2d) 220008, ¶ 51. "[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute

16

its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Instead, "it is our duty to carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004), and *Smith*, 185 Ill. 2d at 541).

¶ 45     In this case, defendant contends that the jury erred in finding him guilty of aggravated battery, as the State failed to establish that defendant was not acting in defense of himself or others. When a defendant raises an affirmative defense, as defendant did here, the State bears the burden of disproving the elements of that defense beyond a reasonable doubt. *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995). In other words, where the defendant raises a self-defense claim, the State must prove beyond a reasonable doubt that the defendant did *not* act in self-defense. *People v. Lee*, 213 Ill. 2d 218, 224 (2004).

¶ 46     To raise a claim of self-defense, a defendant must present some evidence that (1) force was threatened against a person, (2) the person threatened is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) his beliefs were objectively reasonable. *Jeffries*, 164 Ill. 2d at 127-28; *Lee*, 213 Ill. 2d at 225; see *People v. Taylor*, 2016 IL App (1st) 141251, ¶ 11 (considering same elements in defense of others). If the State negates any of the elements required for such a defense, the defendant's claim of self-defense fails. *Jeffries*, 164 Ill. 2d at 128; *Lee*, 213 Ill. 2d at 225.

¶ 47    Here, the basis for the aggravated battery charge against defendant was his action in striking Beam with a glass bottle. Thus, we must determine whether a rational jury could have found that, in doing so, defendant was not acting in self-defense or in defense of others. We agree with defendant that the entire course of events is relevant in considering this question. See *People v. Wiley*, 2025 IL App (5th) 230036-U, ¶ 63 (considering the entirety of the incident, not merely "the final moments when the violence occurred").

¶ 48    With respect to his claim of self-defense, we similarly agree with defendant that he established most of the applicable elements. At the time he struck Beam with the bottle, Beam was rushing at defendant with a knife. Thus, force was clearly threatened against defendant, and the danger of harm was imminent—in fact, it was immediate. From defendant's perspective, Beam's use of force would have appeared unlawful, as defendant was unaware that Beam had recently been attacked twice. Similarly, the evidence demonstrates that defendant actually and subjectively believed that Beam was going to stab him, and that belief was objectively reasonable, given that Beam was, in fact, in the process of attempting to do so.

¶ 49    The difficulty with defendant's self-defense claim, however, is the remaining element—that defendant was not the aggressor. A claim of self-defense is not available to a person who "initially provokes the use of force against himself" unless such force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm and he has exhausted every reasonable means to escape such danger other than the use of force that is likely to cause death or great bodily harm to the assailant. 720 ILCS 5/7-4(c)(1) (West 2022).

¶ 50    In this case, a rational jury could have determined that defendant was the initial aggressor in his interaction with Beam. Defendant chose to involve himself in the ongoing altercation on the train, despite having no connection with it other than being a fellow train passenger.

Defendant sought out Beam and then, upon finding him, worked with Holman and Thomas to pursue him until Beam was effectively trapped on the train car, with defendant in the doorway and Holman and Thomas blocking the aisle. In order to escape the train car, Beam needed to pass defendant, which he ultimately did by running at defendant with the knife. Defendant could easily have avoided the danger by merely stepping aside. Consequently, a rational jury could have determined that the State established beyond a reasonable doubt that defendant was not acting in self-defense. See *Jeffries*, 164 Ill. 2d at 128 (if the State negates any of the elements required for such a defense, the defendant's claim of self-defense fails).

¶ 51    The analysis for defendant's related claim, that of defense of others, is slightly different, as it encompasses more than the proceedings directly involving defendant. Under defendant's theory, upon learning that an individual on the train was stabbing people, defendant decided to stop the perpetrator. Defendant observed evidence supporting the veracity of the stabbing claims, as he encountered injured individuals on the train, and he engaged with Beam in that context—as the perpetrator of violence occurring on the train. Under this theory, defendant's actions were focused on subduing Beam to stop him from injuring anyone else.

¶ 52    The problem, however, with defendant's theory is that he was relatively removed from the earlier activity. He was not present when either of the stabbings occurred and, in fact, was several train cars away with no knowledge of the activity until someone reported it to him. At the time that defendant encountered Beam, Beam was in a defensive posture; indeed, Beam spent the entirety of the time attempting to flee from the people chasing him.

¶ 53    Given defendant's remoteness from the initial activity, a reasonable jury could have determined that defendant was not acting in defense of others. Defendant chose to involve himself in a situation in which he did not have all the facts, proceeding under the assumption

that Beam was a wrongdoer based on secondhand information. At the time that he encountered Beam, Beam was not stabbing anyone or otherwise engaging in violent activity—he was fleeing, and he continued to do so throughout the encounter. While Beam did run at defendant with a knife, as noted, it was his only avenue of escape, as defendant blocked the doorway and Holman and Thomas blocked the aisle. As the State observes, there are any number of elements that the jury could rationally have determined defeated defendant's claim of defense of others—including a lack of imminent threat of harm to others that justified the use of force. Accordingly, we cannot find that the State failed to prove defendant guilty of aggravated battery beyond a reasonable doubt.

¶ 54                                    *Jury Instructions*

¶ 55        Defendant next contends that he is entitled to a new trial where the trial court improperly instructed the jury and provided a misleading response to a jury question. "The function of jury instructions is to provide the jury with accurate legal principles to apply to the evidence so it can reach a correct conclusion." *People v. Hartfield*, 2022 IL 126729, ¶ 51. There must be some evidence in the record to justify the giving of an instruction, and it is within the trial court's discretion to determine whether an instruction should be given. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). An instruction, however, that is not supported by the evidence or the law should not be given, nor should an instruction that could confuse the jury. *People v. Sloan*, 2024 IL 129676, ¶ 14.

¶ 56        The jury instructions must be read as a whole, not in insolation, and " '[w]e must determine whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles.' " *Hartfield*, 2022 IL 126729, ¶ 51 (quoting *People v. Parker*, 223 Ill. 2d 494, 501 (2006)). While the trial court's decision to give a particular instruction is

generally reviewed for an abuse of discretion, the question of whether the jury instructions accurately conveyed the applicable law is reviewed *de novo*. *People v. Woods*, 2023 IL 127794, ¶ 55.

¶ 57 In this case, defendant claims that the trial court erred in providing the provocation instruction to the jury. The jury received the following instruction:

"A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes that he is [in] imminent danger of death or great bodily harm and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person."

Defendant contends that there was no evidence that he was the initial aggressor in any conflict with Beam and that, consequently, the instruction should not have been given. We do not find this argument persuasive.

¶ 58 The provocation instruction is warranted "when either the State presents evidence that defendant was the aggressor or the case involves a question of whether defendant was the aggressor." *People v. Brown*, 406 Ill. App. 3d 1068, 1079 (2011). Here, as explained above, there was some evidence that defendant was the initial aggressor with respect to his self-defense claim—at a minimum, there was a question as to whether defendant was the aggressor. Therefore, the trial court did not abuse its discretion in instructing the jury accordingly. See *People v. Floyd*, 262 Ill. App. 3d 49, 55-56 (1994) (where the provocation instruction is given in conjunction with an instruction concerning justifiable use of force principles, "the jury is able to resolve the issues under either hypothesis").

¶ 59        Defendant also claims that, with respect to his claim of defense of others, the instruction misstated the law. Defendant maintains that the provocation instruction is inapplicable to a claim of defense of others, so giving it misled the jury to believe that, "no matter how much an assailant might endanger bystanders, a defendant who provokes an assailant to use force against him instead cannot act to defend those bystanders." The State contends that defendant has forfeited this claim, as he did not raise it below.

¶ 60        Generally, a defendant forfeits review of a claimed jury instruction error where he does not object to the instruction or offer an alternate instruction and does not raise the issue in a posttrial motion. *Hartfield*, 2022 IL 126729, ¶ 44. This does not require the objection at trial to be identical to the matter raised in the posttrial motion. *Id.* A defendant, however, cannot raise one issue below and a different one on appeal, especially where those issues are distinct and warrant different standards of review. *Id.* ¶¶ 44-45.

¶ 61        In this case, defendant's objection to the provocation instruction below was based on the evidence—or lack thereof—supporting such an instruction. As explained above, the question of whether the evidence supports the giving of a jury instruction is reviewed for an abuse of discretion. See *Woods*, 2023 IL 127794, ¶ 55. The issue defendant now poses, however, asks whether the instruction accurately reflects the law with respect to his claim of defense of others, a question which is reviewed *de novo*. See *id.* In similar circumstances, our supreme court has found the defendant's claim of instructional error forfeited on appeal. See *Hartfield*, 2022 IL 126729, ¶ 48. Consequently, we similarly find that the claim has been forfeited.

¶ 62        Defendant, nonetheless, asks us to review his claim for plain error. The plain-error doctrine permits a reviewing court to consider an unpreserved claim (1) if a clear or obvious error occurred and the evidence is so closely balanced that this error alone threatened to tip the scales

of justice against the defendant, regardless of the seriousness of the error, or (2) if a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence at the defendant's trial. *People v. Sebby*, 2017 IL 119445, ¶ 48; *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In both cases, the burden of persuasion remains with the defendant. *Hartfield*, 2022 IL 126729, ¶ 50. "[A] jury instruction error rises to the level of plain error only when it creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." (Internal quotation marks omitted.) *Id.* The first question in any plain-error analysis, however, is whether any error occurred. *Id.* ¶ 51.

¶ 63     In this case, we cannot find that the provocation instruction misled the jury or inaccurately stated the law. Section 7-4(c) of the Criminal Code of 2012, which is the underlying statutory basis for the provocation instruction, provides, in relevant part:

> "The justification described in the preceding Sections of this Article is not available to a person who:
>
> * * *
>
> (c) Otherwise initially provokes the use of force against himself, unless:
>
>> (1) Such force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm, and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant[.]" 720 ILCS 5/7-4(c)(1) (West 2022).

One such "justification described in the preceding Sections of this Article" (*id.*) is the provision justifying use of force in defense of "himself or another against such other's imminent use of unlawful force" (*id.* § 7-1(a)). Thus, by its own terms, section 7-4(c) would apply to bar the application of section 7-1(a), regardless of whether the claimed justification was defense of self or defense of others. See *Taylor*, 2016 IL App (1st) 141251, ¶ 11 (including "defendant was not the aggressor" when listing elements necessary to establish defense of others).

¶ 64    We also observe that the hypothetical scenarios posed by defendant have no application to his actual circumstances. The provocation instruction would only preclude a defense of others claim where the defendant is the *initial* aggressor. As such, if the defendant intervenes in an already-occurring situation, he would not be considered the initial aggressor. Thus, we cannot agree with defendant that the instruction "effectively eliminates the justification of defense of others." Since the instruction accurately conveyed the law, we cannot find that there was any error and therefore reject defendant's challenge to the provocation instruction.

¶ 65    Defendant's final contention with respect to the jury instructions concerns the trial court's answer to the jury's note. The jury note contained the two instructions related to defendant's affirmative defenses—the justification instruction and the provocation instruction—and included a handwritten note on each asking, "Who does this apply to?" and "Who does this definition apply to?" After discussion with counsel, the trial court ultimately responded to the note by stating: "Your attached instructions are to be considered only as to the defendants— plural—alleged conduct and as to whether the State has proven their allegations against the defendants." Defendant claims that the jury's question indicated its confusion as to which instruction applied to which defendant and that the trial court's response did not resolve any confusion.

¶ 66    "Jurors are entitled to have their questions answered." *People v. Reid*, 136 Ill. 2d 27, 39 (1990). Accordingly, the general rule is that the trial court has the duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion. *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994). "When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy." *Id.* at 229. If the question asked is unclear, it is the trial court's duty to seek clarification. *Id.* "The failure to answer or the giving of a response which provides no answer to the particular question of law posed has been held to be prejudicial error." *Id.*

¶ 67    In this case, the jury requested clarification on the applicability of the two defense instructions. Defendant claims that this was likely due to the structure of the immediately preceding jury instructions, which expressly named either defendant or Holman. As the two defense instructions did not name either defendant, the jury's question sought to determine whether the instructions were similarly apportioned between the defendants. Defendant's theory is certainly plausible. We cannot, however, agree with his claim that the trial court's answer to the question failed to resolve any confusion.

¶ 68    The trial court's answer expressed that the two defense instructions were applicable to the two defendants—"plural"—and their alleged conduct. Thus, the trial court clarified that, unlike the preceding instructions, these instructions were *not* apportioned between the two defendants and that they applied to both. While defendant maintains that the jury believed that only the provocation instruction applied to him, we cannot find this to be a plausible reading of the instruction. Moreover, even if it was, the provocation instruction *did* apply to him—both instructions did. In order for defendant to be justified in his actions, the jury was required to find that he was not the initial aggressor.

25

¶ 69    We find no support for defendant's claim that the use of the instruction "risked directing an element against" him. The use of the provocation instruction "does not erroneously assume that the defendant was the initial aggressor." *Floyd*, 262 Ill. App. 3d at 56. Thus, the fact that the jury was provided the instruction and instructed to "considered [the instruction] only as to the defendants—plural—alleged conduct and as to whether the State has proven their allegations against the defendants" did not risk directing an element of the crime against him. Consequently, we cannot find that the trial court erred in instructing the jury or in responding to the jury note.

¶ 70                                *Polling of Jury*

¶ 71    The final issue raised by defendant concerns the polling of the jury. After the jury returned its verdict, defense counsel requested that the jury be polled. The trial court did so but polled only 11 of the 12 jurors. Defendant contends that, due to the closeness of the evidence, this error requires a new trial. Defendant failed to raise this issue below, so he asks us to review his claim for plain error. As noted, a reviewing court will consider an unpreserved claim (1) if a clear or obvious error occurred and the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) if a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence at the defendant's trial. *Sebby*, 2017 IL 119445, ¶ 48; *Piatkowski*, 225 Ill. 2d at 565.

¶ 72    "A criminal defendant's right to request a polling of the jury is a safeguard that is designed to help ensure that the defendant is afforded an important constitutional right, *i.e.*, juror unanimity." *People v. Jackson*, 2022 IL 127256, ¶ 33. As such, where a jury is polled, the trial

court commits a clear and obvious error by polling less than all of the jurors. *Id.* ¶ 21 (trial court committed "clear or obvious error when it polled only 11 of the 12 jurors"). An error in polling the jury, however, does not represent structural error under the second prong of the plain-error analysis and, accordingly, is reviewed under the first prong of the analysis. *Id.* ¶ 53.

¶ 73    In this case, the parties do not dispute that the trial court committed an error in polling only 11 of the jurors. We therefore consider whether the error constituted plain error under the first prong of the plain-error analysis. Under the first prong, an error rises to the level of plain error if the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. *Sebby*, 2017 IL 119445, ¶ 48; *Piatkowski*, 225 Ill. 2d at 565.

¶ 74    Here, we cannot find that the failure to poll a single juror threatened to tip the scales of justice against defendant. There was no indication that the jury was less than unanimous—all 12 jurors signed the verdict form, the jury was instructed it was required to reach a unanimous verdict, and the remaining juror did not voice any objection during the polling. See, *e.g.*, *People v. Flores*, 2021 IL App (1st) 192219, ¶ 19 (considering such factors in finding no plain error); *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 112 (same). Accordingly, we cannot find that the error rises to the level of plain error such that a new trial is warranted.

¶ 75                                  CONCLUSION

¶ 76    For the reasons set forth above, defendant's conviction is affirmed. First, a rational jury could have found defendant guilty beyond a reasonable doubt. Second, the trial court did not err in instructing the jury. Finally, the trial court's error in polling only 11 of the 12 jurors did not rise to the level of plain error.

¶ 77    Affirmed.

***People v. Williams*, 2025 IL App (1st) 240582**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-CR-09320(01); the Hon. Alfredo Maldonado, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Jonathan Yeasting, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Tasha-Marie Kelly, and Julie Riekse, Assistant State's Attorneys, of counsel), for the People. |