2026 IL App (1st) 242499-U

No. 1-24-2499

Order filed March 6, 2026

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 CR 0862801 |
| | ) | |
| JEFFREY TABARES, | ) | Honorable |
| | ) | Paul S. Pavlus, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Pucinski and Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's aggravated battery conviction where there was sufficient evidence that he did not act in self-defense.

¶ 2    Following a bench trial, defendant Jeffrey Tabares was found guilty of one count of aggravated battery causing great bodily harm (720 ILCS 5/12-3.05(a)(1) (West 2022)) and sentenced to 30 days' conditional discharge. On appeal, he challenges the sufficiency of the evidence disproving that he acted in self-defense. We affirm.

¶ 3 After an incident on June 20, 2023, defendant was charged with six counts of aggravated battery, one count of unlawful restraint, and one count of aggravated unlawful restraint. Relevant here, count IV for aggravated battery alleged that defendant knowingly caused Riley Gibbons great bodily harm by striking Riley about the head.[1] Defendant's answer to discovery indicated that he would assert the affirmative defense of self-defense.

¶ 4 Riley testified that he went for a walk around his Park Ridge neighborhood shortly after 8 p.m. on June 20, 2023, and observed a basketball hoop attached to a garage in an alley. He entered the alley, picked up a rock, and "dunked" it through the hoop. He did not notice a loud noise or property damage and left the alley. When Riley was halfway down the street, a woman whom he had never seen before approached him accompanied by two small dogs. (This woman was later identified as Lindsey Malone, defendant's wife.) Malone held a phone to her ear and was "screaming," claiming that Riley had been in her alley and asking what his name was, what he had been doing, and where he lived. The dogs barked and jumped on Riley, who admitted to Malone that he had been in the alley and asked her to stop yelling and call off her "f*** dogs." Riley did not answer her questions but said he was "painfully nice to her." Malone accused Riley of breaking into the garage and committing theft. Riley emptied his pockets to show her he had not taken anything and walked away, and she briefly followed him, continuing to hold the phone to her ear and yell.

¶ 5 As Riley neared his house, a van stopped behind him. Defendant, whom Riley identified in court, exited the vehicle "with a golf club, screaming *** 'I got him, I got him, let's go.' "

---

[1] Because Riley Gibbons and two other witnesses, Stephen Gibbons and Sheri Gibbons, share a surname, we refer to each by his or her first name. Sheri's name also appears as "Sherry" in the record.

Defendant blocked Riley's path, demanded to see Riley's shirt, and yelled at him to "get on [his] knees." Riley tried to walk around defendant, but defendant "kept pushing" him in the chest.

¶ 6     Defendant then swung the golf club at Riley, who raised his left arm, catching the blow "around the tricep area." Riley screamed for help, and defendant demanded again that Riley kneel. Riley tried to move around defendant, who pushed Riley back again. Then Riley "got down" and reached for the club. Defendant swung the golf club again, striking Riley's left ear and the area behind it. Riley felt blood dripping from his ear and fell in the street while defendant yelled that Riley "shouldn't have done that" and was "asking for it."

¶ 7     Riley "stumbl[ed]" home, and "scream[ed]" for help once inside. His parents "rushed out," and he joined them. Defendant approached Riley's father, Stephen Gibbons, and stated that defendant would "take both" Stephen and Riley. At this point, Riley was rolling in the grass, screaming and vomiting.

¶ 8     An ambulance took Riley to the hospital. The record on appeal reflects that he showed the trial court a scar on his arm and a scar and stitches behind his ear, although the court described the stitches being located on the right side of Riley's head. Riley testified that he could not hear out of his left ear after the incident.

¶ 9     On cross-examination, Riley stated that he did not answer Malone's questions because it was "none of her business." Riley added that when defendant arrived, defendant identified himself as Malone's husband and asked Riley to wait for the police. During the confrontation with defendant, Riley did not retreat because he was wearing "slides" and worried about being struck in the back of his head. Riley conceded that he was "substantially bigger" than defendant, stating that he was 6'2", weighed 185 pounds, and had played football as a quarterback. Riley admitted

that defendant did not strike him until after he had "lunged." Defendant first swung the club 10 minutes after driving up to Riley. Between the two swings, defendant "kept pump-faking," or "going stop, forward, stop, forward" with his hands. Riley additionally testified that he did not hear defendant say that defendant wanted to fight Riley and Stephen; Stephen had told Riley that afterwards.

¶ 10    Riley admitted that he took medication for epilepsy, smoked marijuana, and drank alcohol at the time of the incident, although alcohol consumption was contraindicated for his medication.

¶ 11    Stephen testified that he was working at home in the basement when he heard the front door open loudly and Riley "screaming" that someone had hit him in the head with a golf club. Sheri Gibbons, Riley's mother and Stephen's wife, yelled for Stephen to come upstairs. There, he saw blood smeared on the walls and Riley walking out the front door holding a hand on his ear. Stephen and Riley, followed by Sheri, ran down the front steps and saw a van parked in front of the house. Riley yelled that defendant, sitting in the driver's seat, had attacked him.

¶ 12    Stephen approached the van and shouted to defendant, inquiring why he had hit Riley. The van began "inching away," and defendant "scream[ed]" that Riley had "attacked" Malone. After the van pulled away, Stephen returned to the house. Riley was lying on the front lawn vomiting and bleeding profusely from his ear, which was "folded over."

¶ 13    Then, defendant approached the Gibbons' house on foot from down the street. Riley leapt to his feet and "scream[ed]" at defendant, asking why defendant had struck him, while Stephen held Riley up. Defendant said, "Let's go, I'll fight you both." Stephen responded that he wanted to understand what had happened, and defendant replied that Riley had broken into defendant's garage and house and had "attacked" him and Malone. Stephen commented that defendant did not

bear any marks of an attack, and defendant said that he was "elusive" and "people don't get their hands on me." At some point, law enforcement arrived, and defendant crossed the street. Stephen added that Riley's seizures had worsened since the incident.

¶ 14    Park Ridge police detective Frank Lauria testified that on the evening of June 20, 2023, he, Sergeant Eric Hilderbrant, and Detective Ken King interviewed defendant, who was accompanied by counsel, outside defendant's residence. Defendant stated that he had been driving with his children and one of their friends to go to the driving range when he received a call from Malone, who "was very frantic and having a hard time relaying information to him." Malone had told defendant that "something had happened out by their garage," and she had gone outside after hearing "a loud bang" and had seen someone in the alley. She had then gone down the street and saw the same person, at which point she called defendant and "got into a verbal confrontation" with that person. Defendant told the police that Malone described the person's clothing and the direction in which the person had walked.

¶ 15    According to Lauria, defendant proceeded to "drive around the area looking for this person," eventually finding the person and entering into "some sort of a verbal exchange." Defendant then returned to his vehicle to obtain his phone to call the police and also grabbed a golf club. Lauria stated that "there were a couple variations of the events with the golf club." First, defendant told police that he had nothing in his hands when leaving the vehicle; then, he stated that he had the golf club but not his phone; finally, he stated that he had both his phone and the golf club. Defendant said that the person walked toward the vehicle, so defendant told him to "stay there" and to kneel. The person refused, lunged forward, and advanced towards the vehicle, so defendant struck him in the "upper body." The person asked why defendant had done that, and

defendant told him "to stay there" and not do anything. The person lunged again, and defendant swung a second time.

¶ 16    According to Lauria, defendant told the police he only realized he had struck the person's head once defendant saw blood on the person's hand. Defendant told the person to stay put and that defendant would call 911. The person walked away, and defendant returned to his vehicle, where he called 911. Defendant then drove by a house from which the person emerged followed by his parents. Defendant told the parents that the person had attacked Malone and that defendant was going home but would return.

¶ 17    Lauria further testified that he did not find any evidence of property damage, burglary, or trespassing in the alley behind defendant's house. On redirect examination, Lauria stated that he was unaware of Riley having committed a crime.

¶ 18    Hilderbrant testified that he arrived at the Gibbons' residence and saw defendant, Stephen, Sheri, and Riley out front; Riley was on the ground with "a large wound on his head," which was bleeding, and he "appeared unable to stand." Hilderbrant called for back-up and directed responding officers to accompany defendant home for an interview.

¶ 19    Park Ridge police officer and evidence technician Angelina Leja testified that she found the head of a golf club approximately one block from the Gibbons' residence.

¶ 20    Dr. Jordan Teitelbaum testified that Riley suffered a nondisplaced fracture of his left temporal bone and exhibited hearing loss in his left ear in the months following the incident.

¶ 21    The State also called Malone, who testified that she was alone in her bedroom on the evening of June 20, 2023, when she heard "a loud boom," like her garage door being lifted and slammed down, from the alley behind the house. The garage had been broken into several times

previously, and bikes and tools had been stolen. Malone went to the window and saw a man crouched outside the fence between her detached garage and her car. Seeing the person walking down the alley, she went to her back porch to investigate further and saw the person turning out of the alley. She then went out the front gate, accompanied by her dogs.

¶ 22    Malone walked down the street, and upon seeing whom she assumed to be the person who had been behind her garage, asked him if he had been near her garage. He responded that she should "look at the cameras" or "footage." Malone asked if he had been on her property, and he did not answer—instead, he raised his voice and asked what she was doing and where she lived. She then asked where he lived while her dogs barked at him. He refused to give his address, although she later told police he had said he lived in Indiana. "Frantic," Malone called defendant and told him that someone had been "in or around" their garage, and she did not know if he "had done something or taken something," but she was scared. She also gave defendant a description of the person along with the direction in which he had gone. The person walked away, and Malone briefly followed. At some point, the person lunged and screamed at her. She elaborated on cross-examination that the person advanced towards her, his arms and chest out, when she asked her first question and near the end of their interaction, which prompted her to call defendant.

¶ 23    The State recalled Lauria, who testified that defendant gave law enforcement the shaft of the golf club involved in the incident. The club belonged to defendant's daughter and was 2 to 2½ feet long.

¶ 24    The defense called Connor Reinhofer, who testified that he was in the van that evening with defendant and defendant's children. Defendant answered a call from Malone on speaker

phone, and Reinhofer heard her telling defendant that someone had been "in their garage area in the backyard" and her giving defendant the person's description.

¶ 25    Defendant started to drive back to his residence and encountered someone younger than defendant, labeled a "kid" by Reinhofer, on the sidewalk. Defendant parked, exited the vehicle, grabbed the golf club, and approached the kid. Defendant asked the kid why he had been on defendant's property and told him to wait while defendant called the police, but the kid lunged at defendant. Defendant swung the golf club and struck the kid's arm. The kid stepped backwards toward the van, clenched his fists at his sides, and began yelling "I'm gonna" at defendant, although Reinhofer could not remember what the kid said he would do. At this point, defendant and the kid were five or six feet apart, and, after approximately 20 seconds, the kid lunged a second time. Defendant swung the club, striking the kid's ear. The kid then ran into a house. Defendant reentered the van, "followed" the kid, and waited outside the house.

¶ 26    On cross-examination, Reinhofer added that Malone told defendant over the phone that she was following the person and that she told defendant in which direction the person had gone. Following Malone's call, defendant drove around searching for the person Malone had described. Reinhofer denied that defendant ordered the kid to his knees but testified that defendant was blocking the kid's way home. The kid stumbled but did not fall after being struck, and a lot of blood came from the kid's ear. The golf club's head broke off when defendant hit the kid a second time. Defendant told the kid's parents that the police were coming and then drove the children to defendant's residence, calling the police en route.

¶ 27    After closing arguments, the trial court found defendant guilty of count IV for aggravated battery causing great bodily harm.

¶ 28 The court found that Riley had been in the alley behind defendant's residence that night, and there had been "a loud noise" that caused Malone to confront Riley. The court found Malone's testimony credible and did not believe Riley's assertion that he had been "painfully nice" to her. The court said that their conversation "didn't go well," that Riley left, and that Malone called defendant.

¶ 29 The trial court stated that defendant "went looking" for the person Malone described. The court wondered why defendant did not call the police or stay in his vehicle but concluded that "[t]he only thing that matters is what the defendant *** did" when exiting the vehicle. Defendant "just didn't get out of the car" but also "grabbed this golf club." Although the court did not believe "a lot" in Riley's testimony, it remarked that Reinhofer's testimony confirmed that defendant had taken the club upon exiting his vehicle.

¶ 30 The trial court stated "there was a confrontation." In considering "who was the aggressor," the court noted that "defendant *** drove up, got out of his car" and "arm[ed] himself with *** the club head attached to this shaft." The court reasoned that if defendant feared Riley, defendant would have called the police or stayed in his vehicle. The court stated that medical testimony corroborated that defendant hit Riley in the arm, Riley fell down, and defendant struck Riley's head.

¶ 31 According to the trial court, "even if the defendant felt that his safety was in peril, *** he had no right to pull [the golf club] from the car." Thus, the State had proven beyond a reasonable doubt that "in no way *** did the defendant have the legal right—if you even want to say defend himself, but I don't think he was defending himself—did he have the legal right to pull this golf club with this head attached to it" and strike Riley's head.

¶ 32    The court further ruled, as to the injury to Riley's head, that the State had proven beyond a reasonable doubt that "defendant caused great bodily harm" without "legal justification." The court found that the injury to Riley's arm did not constitute great bodily harm. The trial court found defendant not guilty of the remaining counts for aggravated battery, unlawful restraint, and aggravated unlawful restraint.

¶ 33    Defendant filed a motion to reconsider, which the trial court denied. After a hearing, the court sentenced defendant to 30 days' conditional discharge.

¶ 34    On appeal, defendant argues that the State's evidence was insufficient to disprove his self-defense claim.

¶ 35    On a challenge to the sufficiency of the evidence, this court must ascertain whether any rational trier of fact, viewing the evidence in the light most favorable to the State, " 'could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Welch*, 2025 IL App (1st) 231116, ¶ 18 (quoting *People v. Smith*, 185 Ill. 2d 532, 541 (1999)). We apply "[t]he same standard" when reviewing "whether the State proved that the defendant did not act in self-defense." *People v. Williams*, 2025 IL App (1st) 240582, ¶ 44. The trial court is tasked with determining witness credibility, resolving conflicts in testimony, weighing the evidence, and drawing reasonable inferences as to basic and ultimate facts. *People v. Daniels*, 2025 IL App (1st) 230823, ¶¶ 17, 20. A reviewing court will not retry a defendant or substitute its judgment for the trier of fact's. *People v. Kline*, 2024 IL App (1st) 221595, ¶ 58. We will reverse a conviction "only where the evidence presented was so improbable, unreasonable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains." *People v. Thomas*, 2025 IL App (1st) 232035, ¶ 40.

¶ 36    As charged, a person commits aggravated battery if, when committing battery, he knowingly causes great bodily harm without legal justification. See 720 ILCS 5/12-3(a), 12-3.05(a)(1) (West 2022). Defendant does not challenge the sufficiency of the evidence that he knowingly caused great bodily harm to Riley but maintains that he did so in self-defense.

¶ 37    Self-defense is the use of such force by a non-aggressor " 'as that person reasonably believes is necessary for self-protection against another person's threatened, imminent, and unlawful force.' " See *People v. Wilson*, 2025 IL App (1st) 230027, ¶ 60 (quoting *People v. Robinson*, 163 Ill. App. 3d 754, 761 (1987)); see also 720 ILCS 5/7-1 (West 2022).

¶ 38    A defendant must introduce evidence supporting each element of self-defense. *People v. Redmond*, 2025 IL App (1st) 231795, ¶ 67. Specifically, he must sufficiently show that (1) "unlawful force" was "threatened against" him, (2) he was "not the aggressor," (3) the risk of harm was "imminent," (4) "the use of force was necessary," (5) he "actually and subjectively believed a danger existed" requiring the application of the use of force, and (6) his beliefs were "objectively reasonable." (Internal quotation marks omitted.) *Id.* A " 'slight amount of evidence' " suffices to raise a self-defense claim. *Wilson*, 2025 IL App (1st) 230027, ¶ 60 (quoting *People v. Jaffe*, 145 Ill. App. 3d 840, 852 (1986)). The burden then shifts to the State to disprove the elements of self-defense beyond a reasonable doubt. *Wilson*, 2025 IL App (1st) 230027, ¶ 60. If the State negates any one element, a self-defense claim fails. *Williams*, 2025 IL App (1st) 240582, ¶ 46.

¶ 39    On appeal, defendant urges that the State's evidence was insufficient to disprove any elements of his self-defense claim. Among other things, he contends that Riley was the initial aggressor by starting the entire interaction. Defendant further argues that, even if he were the aggressor when exiting the vehicle with a golf club, Riley reclaimed that role when he was the first

to resort to physical force when lunging at defendant following a 10-minute stalemate after defendant's arrival. Defendant also contends that he actually and subjectively believed that Riley posed a danger requiring the application of force due to the size and age disparity between the two and because Riley lunged at him. Finally, defendant insists the State's evidence was insufficient to disprove self-defense because defendant was empowered to use force in making a citizen's arrest of Riley for disorderly conduct and assault, and in response to Riley attempting to seize the golf club.

¶ 40    The trial court, as noted, ruled that defendant struck Riley without justification, finding that defendant had been the initial aggressor and had not acted out of an actual or subjective belief of danger. Viewing the evidence in the light most favorable to the State, we cannot say that no rational trier of fact would have made these findings.

¶ 41    Whether defendant was the initial aggressor is a question of fact. *People v. Cruz*, 2021 IL App (1st) 190132, ¶ 44. It is for the trier of fact to make such determinations by ascertaining witness credibility, resolving inconsistencies in the evidence, and drawing reasonable inferences therefrom. See *Daniels*, 2025 IL App (1st) 230823, ¶¶ 17, 20. As noted, we will not substitute our judgment for the trier of fact's or retry the defendant. See *Kline*, 2024 IL App (1st) 221595, ¶ 58.

¶ 42    Here, the trial court's finding of defendant as the initial aggressor was consistent with evidence of his conduct. Defendant pursued Riley, exited his vehicle to confront Riley while armed with a child's golf club, and gave orders to Riley. Riley testified that defendant pushed him whenever Riley tried to go around defendant. A rational factfinder viewing all the evidence in the light most favorable to the State could have concluded that defendant was the initial aggressor. See *Williams*, 2025 IL App (1st) 240582, ¶¶ 47, 50 (concluding that a rational jury could have

found that the defendant did not act in self-defense after considering the entire sequence of events in which the defendant pursued and blocked the victim); see also *Cruz*, 2021 IL App (1st) 190132, ¶¶ 55-56 (collecting cases in which brandishing a weapon warranted initial-aggressor jury instructions).

¶ 43    Additionally, a rational factfinder, viewing all the evidence in the light most favorable to the State, could have found that defendant was still the initial aggressor when Riley lunged at him. The evidence at trial showed, at best, that defendant approached Riley armed with a child's golf club, demanded that Riley wait for the police, did not withdraw or discard the golf club during those 10 minutes, and did not retreat either time Riley lunged. The evidence showed that defendant shouted for Riley to get on his knees and also put his hand on Riley' chest and shoved Riley back whenever Riley tried to go around him during those 10 minutes. The evidence at trial was sufficient to establish that defendant was the initial aggressor. See *Williams*, 2025 IL App (1st) 240582, ¶ 50 (rational jury could have found defendant the initial aggressor where he pursued and trapped victim and could have avoided danger by stepping aside).

¶ 44    Another element of self-defense that defendant contests—whether he actually and subjectively believed himself to be in danger requiring the use of force—is also a question for the factfinder. See *People v. Washington*, 2012 IL 110283, ¶ 36. The evidence at trial, viewed in the light most favorable to the State, supported the trial court's finding that defendant did not actually or subjectively believe Riley to pose a danger. Defendant left the safety of his vehicle to confront Riley. Defendant could have retreated when Riley lunged and could have abandoned the confrontation in the 20 seconds between his first and second blows to Riley.

¶ 45    Similarly, we find unpersuasive defendant's argument that his use of force was justified because he was performing a citizen's arrest. Illinois permits private persons to arrest those they have reasonable grounds to believe committed an offense other than an ordinance violation. 725 ILCS 5/107-3 (West 2022). However, in doing so, a private person may only use force likely to cause death or great bodily harm if he reasonably believes that such force is necessary to prevent death or great bodily harm. 720 ILCS 5/7-6(a) (West 2022). In finding that defendant was unjustified in striking Riley—particularly in finding that defendant did not have an actual or subjective fear of harm—the trial court found that defendant did not reasonably believe such force was necessary to prevent such harm.

¶ 46    The State's evidence was sufficient to disprove at least two elements of self-defense. Because the failure of one element mandates the failure of a self-defense claim, defendant's challenge to his conviction lacks merit. See *Williams*, 2025 IL App (1st) 240582, ¶¶ 46, 49-50.

¶ 47    For these reasons, we affirm the circuit court's judgment.

¶ 48    Affirmed.